**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULETTE MITTO and DAVID GERVAIS *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>-against-<br><br>MOUNT SINAI HEALTH SYSTEM, INC.,<br><br>Defendant. | Case No.: 25-cv-7461<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff JULETTE MITTO and DAVID GERVAIS ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, as and for their Class and Collective Action Complaint against Defendant MOUNT SINAI HEALTH SYSTEM, INC., ("Defendant"), state as follows:

## INTRODUCTION

1. Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 et seq. ("FLSA"), that he and others similarly situated are entitled to recover from Defendants: (1) unpaid wages, including overtime wages, due to time shaving, (2) liquidated damages, and (3) attorneys' fees and costs.

2. Plaintiff further alleges, pursuant to the New York Labor Law ("NYLL"), that he and others similarly situated are entitled to recover from Defendants: (1) unpaid wages, including overtime wages, due to time shaving, (2) liquidated damages, and (3) attorneys' fees and costs.

3. Defendant is an integrated health care system providing medical care throughout New York City. The Mount Sinai health system operates around health centers located at the

following addresses:

a. Mount Sinai Kravis Children's Hospital, 1184 Fifth Avenue, New York, NY 10029

b. Mount Sinai-Behavioral Health Center, 45 Rivington Street, New York, NY 10002

c. The Spine Hospital at Mount Sinai, 5 East 98th Street, 4th Floor, New York, NY 10029

d. New York Eye and Ear Infirmary of Mount Sinai, 310 East 14th Street, New York, NY 10003

e. Mount Sinai West, 1000 Tenth Avenue, New York, NY 10019

f. Mount Sinai South Nassau, One Healthy Way, Oceanside, NY 11572

g. Mount Sinai Queens, 25-10 30th Avenue, Astoria, NY 11102

h. Mount Sinai Morningside, 1111 Amsterdam Avenue, New York, NY 10025

i. The Mount Sinai Hospital, 1 Gustave L. Levy Place, New York, NY 10029-6574

j. Mount Sinai East, 1450 Madison Avenue, New York, NY 10029

k. Mount Sinai, 1468 Madison Avenue, New York, NY 10029

l. Mount Sinai Brooklyn, 3201 Kings Highway, Brooklyn, NY 11234 (Collectively with any locations not listed here "Health Centers").

4. Plaintiff, putative collective members, and putative class members are current and former non-exempt employees, including nurses, patient care associates, and other similarly positioned employees, who were victims of Defendant's underpayment of employees.

5. Plaintiffs allege that they and other similarly situated employees are entitled to recover from Defendant for their daily pre-shift work, which included temperature checks, sign-ins, wellness attestations and general off-the-clock work, resulting in a unpaid overtime premiums and full wages. Defendants' improper pay practices are designed to, and in fact do, result in a windfall of improperly retained unpaid compensation owed to Plaintiff, putative collective

plaintiffs, and putative class members.

6. Additionally, Plaintiffs allege that they and other similarly situated that two to three times a week, employees are required by their duties to work through their automatically deducted meal break time.

7. Plaintiffs also allege that they and other similarly situated are required to stay past their shifts by a half hour to continue and engage in work due to the time it takes to ensure proper coverage and/or due to mandatory attendance at after-shift team meetings. This post shift work is similarly unpaid by Defendant.

## JURISDICTION, AND VENUE

8. This Court has subject matter jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over this controversy as Defendants' headquarters are located in New York County, New York.

10. Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391(b)(3) as Defendants' headquarters, from which Defendants' policies and practices complained of herein emanated, is located in this district.

## PARTIES

11. At all times relevant herein, Plaintiff JULETTE MITTO was and is a resident of the State of New York, Bronx County.

12. At all times relevant herein, Plaintiff DAVID GERVAIS was and is a resident of the State of New York, Bronx County.

13. At all times relevant herein, Defendant MOUNT SINAI HEALTH SYSTEM, INC.

was and is a domestic business corporation duly organized under and existing by virtue of the laws of the State of New York, and having its principal place of business at 150 East 42nd Street Second Floor New York, NY 10017. Defendant's address for service of process is located at One Gustave L. Levy Place, New York, NY, 10029.

14. All of Defendants' Health Centers s are managed by the same executive management team operating from the same headquarters, which sets standardized policies and managerial training. Further, each branch location is engaged in related activities, share common ownership, and have common business purpose:

(a) Defendant moves its employees between its Health Centers on an as needed basis. Employees, including Plaintiffs, are regularly asked to cover shifts at various Health Centers. Defendant will typically assign whichever employee volunteers to perform this coverage.

(b) When seeking leave or company assistance with other employment issues, employees are directed to contact the same central office, which evaluates requests, hires, fires, trains managerial employees, and sets company-wide policy.

(c) Defendant maintains a centralized payroll department and human resources department. Defendants operate a single career page allowing interested persons to apply to positions relating to all branches of its business. **Exhibit A** (Defendant's Website – Career Page).

(d) Defendants also own and operate other nominally distinct corporate entities, which share assets, managers, executives, owners, employees with Defendants, and engage in common business purpose. Defendants are joint employers of these nominally distinct entities and operate as a single integrated enterprise with these nominally distinct

entities.

15. The Defendant engage in an enterprise whose annual volume of sales made or business done is not less than $500,000, the activities of which affect interstate commerce in that the employees of the Defendants handle goods and materials produced outside of New York (including vehicles, tools, cleaning supplies, and other items) that have moved in interstate commerce, and the Defendants are thus employers subject to the jurisdiction of the FLSA.

16. At all relevant times, Defendants was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, State wage laws, and any regulations thereunder. At all relevant times, the work performed by Plaintiff and Class members was directly essential to the business operated by Defendants.

17. Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## FLSA COLLECTIVE ACTION ALLEGATIONS

18. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all current and former non-exempt employees working as nurses, patient care associates, and other similarly positioned individuals, employed by Defendant on or after the date that is six (6) years before the filing of the Complaint ("FLSA Collective Plaintiffs").

19. At all relevant times, Plaintiffs and other FLSA Collective Plaintiffs are and have. been similarly situated, have had substantially similar job requirements and pay provisions, and have been and continue to be subjected to Defendant's decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all of which have culminated in a willful failure and refusal to pay Plaintiffs and other FLSA Collectives for all hours worked, including

overtime premiums at the rate of one and one half times the regular rate for work in excess of forty (40) hours per workweek, due to Defendant's policies of time shaving from FLSA Collective Plaintiffs wages. The claims of Plaintiffs stated herein are essentially the same as those of other FLSA Collective Plaintiffs.

20. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendant.

## RULE 23 CLASS ALLEGATIONS

21. Plaintiffs bring claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all current and former non-exempt employees working as nurses, patient care associates, and other similarly positioned individuals, employed by Defendants in on or after the date that is six (6) years two-hundred-and-twenty-eight (228) days (pursuant to NY's Executive Order tolling during the COVID pandemic), prior to the filing of the Complaint in this case (the "Class Members").

22. All said persons, including Plaintiffs, is referred to herein as the "Class." The Class Members are readily ascertainable. The number and identities of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and the rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

23. The proposed Class is so numerous that a joinder of all members is impracticable,

and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, as the facts on which the calculation of that number rests are presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class.

24. Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each member of the Class in separate actions. All the Class Members were subject to the same corporate practices of Defendants, as alleged herein, of: (i) failing to pay wages, including overtime, due to time shaving; (iv) failing to provide wage and hour notices, at date of hiring and annually; and (v) failing to provide proper wage statements.

25. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

26. Plaintiff is able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

27. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendant. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

28. Defendants and other employers throughout the country violate state wage laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

29. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a) Whether Defendants employed Plaintiff and Class Members within the

meaning of the state wage laws;

b) What were and are the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and the Class Members;

c) At what common rate, or rates subject to common methods of calculation, was and is Defendants required to pay Plaintiff and Class Members for their work;

d) Whether Defendants properly notified Plaintiff and Class Members of their hourly rate and overtime rate;

e) Whether Defendants properly compensated Plaintiff and Class Members for their hourly rate and overtime rate;

f) Whether Defendants paid Plaintiff and Class Members for the actual hours that they worked;

g) Whether Defendants provided wage and hour notices to Plaintiff and Class Members, at date of hiring and annually, per requirements of the NYLL;

h) Whether Defendants provided proper wage statements to Plaintiff and Class Members per requirements of the NYLL;

i) Whether Defendants' deductions from Plaintiff and Class Members wages were permissible under state wage laws; and

## STATEMENT OF FACTS

*Claims of Plaintiff MITTO*:

30. On January 8, 1990, Plaintiff MITTO was hired to work for Defendant at its 1450 Madison Avenue Health Center as a patient care associate

31. During the relevant statutory period, Plaintiff MITTO was assigned to work within

the brain injury department of Defendant's 1450 Madison Avenue Health Center. Plaintiff MITTO continued to work for Defendants until March 31, 2024, when Plaintiff MITTO's employment was terminated.

32. Throughout her employment, Plaintiff MITTO was assigned to work one of the three following shift schedules:

a. Morning: 7:00 am to 3:30 pm.

b. Evening: 3:00 pm to 11:30 pm.

c. Overnight: 11:15 pm to 7:15 am.

33. Prior to February 2020, Plaintiff MITTO was scheduled to work five (5) morning shifts plus an additional three (3) evening or overnight shifts. During the COVID Crisis, February 2020 to approximately December 2022, Plaintiff MITTO was scheduled to work five (5) morning shifts plus an additional five (5) evening or overnight shifts. Finally, after December 2022, Plaintiff MITTO returned to her pre-covid schedule. Plaintiff MITTO would always work these scheduled hours, plus additional off-the-clock hours which went uncompensated.

34. FLSA Collective Plaintiffs and Class Members were assigned similar shifts and schedules and similarly worked hours in excess of those schedules which went uncompensated.

*35.* Throughout the relevant statutory period, Plaintiff MITTO was compensated at an hourly rate of around twenty-eight dollars and eight-five cents ($28.85) per hour.

*Claims of Plaintiff MITTO*:

36. On January 8, 1990, Plaintiff GERVAIS was hired to work for Defendant at its 1450 Madison Avenue Health Center as a patient care associate

37. During the relevant statutory period, Plaintiff GERVAIS was assigned to work within the brain injury department of Defendant's 1450 Madison Avenue Health Center. Plaintiff

MITTO continued to work for Defendants until March 31, 2024, when Plaintiff GERVAIS's employment was terminated.

38. Throughout her employment, Plaintiff GERVAIS was assigned to work one of the three following shift schedules:

a. Morning: 7:00 am to 3:30 pm.

b. Evening: 3:00 pm to 11:30 pm.

c. Overnight: 11:15 pm to 7:15 am.

39. Prior to February 2020, Plaintiff GERVAIS was scheduled to work five (5) morning shifts plus an additional three (3) evening or overnight shifts. During the COVID Crisis, February 2020 to approximately December 2022, Plaintiff GERVAIS was scheduled to work five (5) morning shifts plus an additional five (5) evening or overnight shifts. Finally after December 2022, Plaintiff GERVAIS returned to her pre-covid schedule. Plaintiff GERVAIS would always work these scheduled hours, plus additional off-the-clock hours which went uncompensated.

40. FLSA Collective Plaintiffs and Class Members were assigned similar shifts and schedules and similarly worked hours in excess of those schedules which went uncompensated.

*41.* Throughout the relevant statutory period, Plaintiff GERVAIS was compensated at an hourly rate of around twenty-eight dollars and eight-five cents ($28.85) per hour.

*FLSA Collective Plaintiffs and Class Members Claims*:

42. Plaintiffs, FLSA Collective Plaintiffs, and Class members were not paid for all hours worked.

43. Plaintiffs, FLSA Collective Plaintiffs, and Class Members were required to engage in pre-shift work, which went uncompensated. Specifically, Defendants required Plaintiffs, FLSA Collective Plaintiffs, and Class Members to engage in off-the-clock work activities prior to

clocking in. Every day, prior to the commencement of their compensable time Plaintiffs FLSA Collective Plaintiffs, and Class Members were required to engage in a temperature check as well as an online attestation of wellness, and only then, if they did not have a fever or COVID symptoms, would employees compensable time begin. This procedure took at least 5 minutes a day. Additionally, for shifts where Plaintiffs, FLSA Collective Plaintiffs and Class Members were required to change into their uniforms and/or protective gear on-site (to avoid contamination and/or ensure cleanliness), employees were required to report to their station in their uniforms prior to their compensable time beginning. Finally, before Plaintiffs, FLSA Collective Plaintiffs and Class Members compensable time would begin, typically at the start of their scheduled time, individuals on-site, including managers, would have requests for pre-shift work.

44. Defendant's mandatory tasks occurring prior to the start of Plaintiffs, FLSA Collective Plaintiffs and Class Members compensable time resulted in an additional 15 minutes of work time for each day worked. Defendants were aware of the extra off-the-clock pre shift work for each employee.

45. For Plaintiffs, who both worked five (5) days a week, this pre-shift work time resulted in an additional 1.25 hours of work per week. Moreover, as Plaintiffs both worked over 40 hours a week, this uncompensated time would be uncompensated overtime hours.

46. Defendant's mandatory tasks occurring prior to the start of Plaintiffs, FLSA Collective Plaintiffs and Class Members compensable time resulted in an additional 15 minutes of work time for each day worked. Defendants were aware of the extra off-the-clock pre shift work for each employee.

47. Defendant automatically deducted a one (1) hour long meal break from all employees.

48. Defendant employed no mechanism to track whether meal breaks were taken by Plaintiffs, FLSA Collective Plaintiffs, and Class Members or how long these meal breaks lasted.

49. Three times a week, Plaintiffs, FLSA Collective Plaintiffs, and Class Members would be unable take a meal break. Plaintiff, FLSA Collective Plaintiffs, and Class Members were required to at their posts, to perform work. This work included engaging in "one to ones" where staff were required to continuously monitor patients to ensure no complications.

50. Despite the lack of lunch break, Defendant would automatically deduct 1 hour from Plaintiff, FLSA Collective Plaintiffs, and Class Members daily compensable time.

51. Plaintiff, FLSA Collective Plaintiffs, and Class Members also worked after their scheduled shift time ended. Plaintiff, FLSA Collective Plaintiffs, and Class Members would be forced to continue working due to their high workload and also attend after shift team meetings.

<u>*Plaintiff's, FLSA Collective Plaintiffs', and Class Members' Wage Theft Prevention Act Claims:*</u>

52. The State of New York has wage laws providing damages for the failure to provide accurate pay documents. In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL— Defendant knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiffs and Class Members at the beginning of their employment with Defendant.

53. Defendants further violated the WTPA by failing to provide Plaintiff and Class Members with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA. *See Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time *actually* worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC,* 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement

should include every hour *actually* 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp*., 2021 U.S. Dist. LEXIS 151528, *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours *actually* worked") (emphasis added).

54. In failing to provide proper wage statements and notices, Defendant has failed to comply with the law in a manner that entails a concrete harm to an interest identified by the legislature of New York, As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010
>
> S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs*., 2020 U.S. Dist. LEXIS 49740, *21-22 (S.D.N.Y. March 20, 2020)

55. Defendant knowingly and willfully operated their business with a policy of not providing proper wage notices and statements as required by NYLL and other state wage laws.

56. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the State legislature of New York. Defendant's failure to provide such notices trivializes the importance of these notices in protecting Plaintiff and Class Members interest in ensuring proper pay. Despite Defendants' conduct, there is a reason why the State legislature concluded that

enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See* N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being paid properly and timely.

57. Here, Defendants’ failure goes beyond generating a risk of harm to Plaintiffs and Class Members. Defendants’ conduct actually harmed Plaintiff and Class Members. Defendants’ failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates and the failure to provide a wage notice properly listing the rate and frequency Plaintiff and Class Members were entitled to get paid, deprived employees of the ability to contest Defendants’ calculations, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff’s and Class Members’ rights. This conduct ensured Defendant’s ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Moreover, Defendants’ failure to provide wage notices allowed Defendants to hide the proper frequency of pay to employees. Defendants’ failure to provide a wage notice to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

58. Due to Defendants’ failure to provide legally mandated notices such as earning statements and wage notices, Defendants were able to hide their wrongdoing from employees and continue to attempt to hide their wrongdoing necessitating the current litigation. The failure to provide notices continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to timely pay bills and delay or forgo purchases.

59. Further, the direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. See *Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-2 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[1]

60. The effect of reporting reduced wages on an employee's W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA]

. . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates. (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . .

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

61. "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, No, 2023 U.S. Dist. LEXIS 38163, at 18, 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y.*, LLC, 2023 U.S. Dist. LEXIS 122504, *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

62. Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiffs with Article III standing.

63. Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes

> because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

64. The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and Class Members rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiff and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

65. Whether or not any Plaintiff and Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

66. The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying

> a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Calderon,* 999 F.2d 1101 at 1106.

67. Here, the problem is not merely challenging but insurmountable. Plaintiff and Class Members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiff and Class Members. The problem, rather, is that Plaintiff and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff and Class Members were irreversibly injured with respect to their social security benefits as soon as Defendants sent their W-2s to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

68. Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices, at the beginning of employment and annually thereafter, pursuant to the requirements of NYLL and other state wage laws.

69. Defendants knowingly and willfully operated their business with a policy of not properly compensating either FLSA overtime rate (of time and one-half) or the State wages and overtime (of time and one-half) to Plaintiff, FLSA Collective Plaintiffs, and Class Members, including due Defendants' policy of time shaving.

70. Defendants knowingly and willfully subjected Plaintiff, FLSA Collective Plaintiffs, and Class Members to time shaving of hours worked in violation of the FLSA and the State wage laws.

71. Plaintiffs retained Joseph & Norinsberg LLC to represent Plaintiff, FLSA Collective Plaintiffs, and the Class, in this litigation and has agreed to pay the firm a reasonable fee for its services.

72. Defendants were or should have been aware of their statutory requirements as employers, including specifically but without limitation the requirements under the FLSA and NYLL to pay Plaintiff and others similarly situated for all of the time they worked (and to pay hours over 40 per week at the premium overtime rate), and to make and preserve proper payroll records.

73. However, Defendants knowingly failed to pay Plaintiff and others similarly situated all of the regular and overtime wages to which they were entitled, and to make and preserve proper payroll records.

74. As such, the various violations of the FLSA and NYLL alleged herein were committed knowingly, willfully, and intentionally by Defendants.

75. Furthermore, these violations are ongoing, as Defendants continue to engage in the wrongful conduct described herein.

## FIRST CAUSE OF ACTION
**(FLSA Collective Action)**

76. Plaintiff realleges and reavers each and every previous allegation as if fully set forth herein.

77. At all relevant times Plaintiff and the other FLSA Collective Plaintiffs were employees of the Defendant within the meaning of the FLSA, and were persons covered by and intended to benefit from the provisions of the FLSA.

78. At all relevant times the Defendant operated as an employer and/or joint enterprise and were an employer within the meaning of the FLSA.

79. At all relevant times the Defendants were employer and/or joint employers of Plaintiff and the other FLSA Collective Plaintiffs.

80. As alleged herein, Plaintiff and the other FLSA Collective Plaintiffs regularly worked regular and overtime hours for Defendants for which they were not paid, in violation of the FLSA.

81. Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and the other FLSA Collective Plaintiffs for all of the hours they worked, including overtime hours, when Defendants knew or should have known such was due.

82. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and the other FLSA Collective Plaintiffs suffered damages in the form of unpaid regular and overtime wages. Plaintiff and the other FLSA Collective Plaintiffs seek judgment in an amount to be determined at trial for these damages as well as an award of liquidated damages, interest, attorney's fees, and costs, as provided for under the FLSA.

**SECOND CAUSE OF ACTION**
**(NYLL Class Action)**

83. Plaintiff realleges and reavers each and every previous allegation as if fully set forth herein.

84. At all relevant times Plaintiff and the other Class members were employees of the Defendants within the meaning of the NYLL, and were persons covered by and intended to benefit from the provisions of the NYLL.

85. As alleged herein, Plaintiff and the other Class members regularly worked in excess of 40 hours per week, but were not paid all of the wages to which they were entitled under the NYLL, including regular and overtime wages.

86. Defendants also failed to provide Plaintiff and the other Class members with accurate wage statements and wage notices, as required under the NYLL.

87. Defendants knew of and/or showed a willful disregard for the provisions of the NYLL as evidenced by their failure to compensate Plaintiff and the other Class members for all of the hours they worked, including overtime hours, when Defendants knew or should have known such was due, and their failure to provide Plaintiff and the other Class members with accurate wage statements.

88. As a direct and proximate result of Defendants' willful disregard of the NYLL, Plaintiff and the other Class members suffered damages in the form of unpaid regular, minimum-wage, and overtime wages. Plaintiff and the other Class members seek judgment in an amount to be determined at trial for these damages as well as an award of statutory penalties, liquidated damages, interest, attorney's fees, and costs, as provided for under the NYLL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court assume jurisdiction herein and thereafter grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA and state wage laws;

b. An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

c. An award of unpaid wages, including overtime, due under the FLSA and state wage laws;

d. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay proper wages, including overtime compensation, pursuant to the FLSA and state wage laws;

e. An award of statutory penalties as a result of Defendants' failure to comply with wage notice and wage statement requirements;

f. An award of statutory penalties, prejudgment and post judgment interest, costs and expenses of this action together with reasonable attorneys' and expert fees and statutory penalties;

g. An award of all owed benefits owed pursuant to state wage laws;

h. Designation of Plaintiffs as Representatives of the FLSA Collective Plaintiffs;

i. Designation of this action as a class action pursuant to F.R.C.P. 23;

j. Designation of Plaintiffs as Representatives of the Class;

k. Statutory penalties and liquidated damages pursuant to the FLSA and state wage laws;

l. Pre- and post-judgment interest; and

m. Plaintiff's costs and reasonable attorney's fees;

n. Together with such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

## NY BCL §630 NOTICE AND DEMAND

Plaintiff hereby gives this notice, in writing, to each shareholder of Defendant, and any of its parents, subsidiaries, or affiliated entities that is served with the summons and complaint in this action, that they intend to hold the shareholders liable under New York Business Corporation Law § 630. This notice is given within one hundred and eighty days after termination of the employment services of Plaintiff.

Plaintiff also demands an examination of the record of shareholders under paragraph (b) of section 624 (Books and records; right of inspection, prima facie evidence) of New York Business and Corporation Law.

An action to enforce such liability shall be commenced within ninety days after the return of an execution unsatisfied against the corporation upon a judgment recovered against it for such services. The provisions of this paragraph shall not apply to an investment company registered as such under an act of congress entitled "Investment Company Act of 1940."

Dated: September 9, 2025
New York, New York

Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

By: ______________________

Robert Kansao, Esq.
*Attorneys for Plaintiff and the Putative Class*
825 Third Ave., Suite 2100
New York, New York 10022
(212) 227-5700
robert@employeejustice.com